UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

KHURRAM S.[1],

    Petitioner,

v.

WARDEN, BERGEN COUNTY JAIL,

    Respondent.

Civil Action No. 20-14807 (JMV)

OPINION

**VAZQUEZ, District Judge:**

Petitioner, an immigration detainee, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. Petitioner seeks his immediate release due to the conditions of his confinement and the COVID-19 pandemic. (D.E. 1.) Respondent filed an Answer opposing relief, (D.E. 3.), and Petitioner did not file a reply. For the reasons stated below, the Court denies the Petition.

**I.    BACKGROUND**

As set forth in the Court's earlier Opinion:

> Petitioner is a citizen of Pakistan and was a permanent resident of the United States. On October 7, 2005, in New York state court, Petitioner was convicted of third-degree grand larceny. Petitioner contends that his attorney erroneously advised him that "his mere presence" in a car with stolen property "made him guilty," and induced him to enter a plea.

---

[1] The Petitioner is identified herein only by his first name and the first initial of his surname in order to address certain privacy concerns associated with immigration cases. The identification of Petitioner in this manner comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

> Petitioner filed a motion to vacate that conviction on November 10, 2020, which remains pending. According to Petitioner, that judgment "will certainly be vacated" and it had formed the basis for his removal order. Although Petitioner offers no further details during the intervening fifteen-year period . . . . the Government provides Petitioner's extensive subsequent criminal history which involved, among other things, numerous drug offenses, gambling offenses, driving under the influence, and unlawful possession of weapons charges.
>
> More importantly, the Government provides that on November 8, 2016, an immigration judge denied Petitioner's applications for relief and ordered his removal to Pakistan. The Board of Immigration Appeals dismissed his appeal on December 6, 2017, and the Second Circuit dismissed his petition for review on September 10, 2020. Consequently, Petitioner has a final order of removal and is subject to detention pursuant to 8 U.S.C. § 1231.
>
> Immigration and Customs Enforcement intends to remove Petitioner once it obtains travel documents from the Pakistani Consulate, but on four occasions in September, October, and November of 2020, Petitioner refused to speak with the consulate or complete his application for travel documents.

*Khurram S. v. Barr*, No. 20-15584, 2021 WL 508619, at *1 (D.N.J. Feb. 11, 2021) (citations omitted) ("*Khurram II*"). In *Khurram II*, Petitioner sought a writ to stay his final order of removal or to otherwise challenge that order. *Id*. at 2. Ultimately, the Court dismissed that matter for lack of jurisdiction. *Id*. As an immigration detainee, the Government continues to house Petitioner at the Bergen County Jail.

In the instant case ("*Khurram I*"), Petitioner filed a § 2241 Petition, arguing that the Government's handling of the COVID-19 pandemic at the jail renders his detention unconstitutional. (D.E. 1.) Petitioner vaguely contends that he "suffers from a condition that renders him immunosuppressed, and more prone to contracting infections and disease . . . [and] suffers from food allergies." (*Id*. at 1.)

2

As to the conditions at the jail, Petitioner maintains that they are "unsanitary" and that there is an "inability to practice social distancing, [which] substantially increases the likelihood that Petitioner will contract the coronavirus." (*Id*.) He argues that if he contracts COVID-19, his "immunosuppressed status makes it unlikely that he will survive the virus." (*Id*.) Petitioner offers no further details about why he is immunosuppressed or the unsanitary conditions at the jail.

Respondent filed an Answer opposing relief, (D.E. 10.), and Petitioner did not file a reply. The Court will review Respondent's efforts to address the pandemic below.

## II. STANDARD OF REVIEW

"Habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994). A petition must "specify all the grounds for relief" and set forth "facts supporting each of the grounds thus specified." 28 U.S.C. § 2254 Rule 2(c) (amended Dec. 1, 2004), applicable to § 2241 petitions through Habeas Rule 1(b). A court addressing a petition for writ of habeas corpus "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted, unless it appears from the application that the applicant or person detained is not entitled there." 28 U.S.C. § 2243.

Thus, "[f]ederal courts . . . [may] dismiss summarily any habeas petition that appears legally insufficient on its face." *McFarland*, 512 U.S. at 856. More specifically, a district court may "dismiss a [habeas] petition summarily when it plainly appears from the face of the petition and any exhibits . . . that the petitioner is not entitled to relief." *Lonchar v. Thomas*, 517 U.S. 314, 320 (1996).

## III. DISCUSSION

The Court construes the Petition as arguing that Petitioner is entitled to habeas relief because (1) his medical issues and the conditions of his confinement during the COVID-19

pandemic constitute undue punishment; and (2) the Government was deliberately indifferent to his medical needs in relation to the pandemic.

Under 28 U.S.C. § 2241(c)(3), a court may grant habeas relief to an immigration detainee who "is in custody in violation of the Constitution or laws or treaties of the United States." In *Hope v. Warden York County Prison*, 972 F.3d 310 (3d Cir. 2020), the Third Circuit held that immigration detainees could challenge the conditions of their confinement in connection with the COVID-19 pandemic through § 2241. *Gallo v. Ortiz*, No. 20-16416, 2021 WL 571600, at *5 (D.N.J. Feb. 16, 2021). The Circuit found that these challenges can fall under the Fifth and Fourteenth Amendments. *Hope*, 972 F.3d at 325. The court in *Hope* observed that an immigration detainee is entitled to the same due process protections as a pretrial detainee under "the Due Process Clauses of the Fifth and Fourteenth Amendments." *Id*. The *Hope* Court noted that "[a]lthough the Eighth Amendment does not apply[,]" an immigration detainee's substantive due process rights guarantee protection from cruel and unusual punishment "at least as robust" as the protection afforded to prisoners under the Eighth Amendment. *Id*.

### A. Undue Punishment Claim

When evaluating whether a detainee's conditions of confinement amount to undue punishment, "[t]he touchstone for the constitutionality of detention is whether [the] conditions of confinement are meant to punish or are but an incident of some other legitimate governmental purpose." *Hope*, 972 F.3d 310 at 326 (internal quotations and citation omitted). This inquiry turns on whether conditions are reasonably related to a legitimate governmental objective. *Id.* (citation omitted). If conditions of confinement are not related to such an objective, then a court may infer an improper purpose. *Id.* (citation omitted).

When reviewing conditions of confinement, a court must consider the totality of the circumstances, "including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose." *Id.* (citing *Hubbard v. Taylor*, 399 F.3d 150, 159–60 (3d Cir. 2005)). Legitimate governmental objectives can include managing detention facilities and associated difficulties in doing so, ensuring that detainees attended removal proceedings, and protecting the public. *Id.* As to the COVID-19 pandemic, a court must also consider improvements at the facilities since the outset of pandemic. *Id.* at 327–28.

With those principles in mind, the Government has a legitimate interest in detaining Petitioner given his final order of removal. Petitioner has not alleged an express intent to punish, and consequently, to succeed, he must show that "his conditions of confinement are arbitrary, purposeless, or excessive and therefore unreasonable in light of the Government's interest in detaining him." *Daniel W. A. v. Decker*, No. 20-8494, 2020 WL 6336182, at *4 (D.N.J. Oct. 29, 2020) (citing *Hope*, 972 F.3d at 325–29).

This Court has reviewed the Government's actions at the jail in response to the pandemic and finds that they are more protective than the measures at issue in *Hope*. *See Hope*, 972 F.3d at 327–28 (listing measures). According to the Government, it has taken the following measures:

- Petitioner is kept in a Housing Unit with other ICE detainees, all of whom remain separate from county inmates. Dato Decl. ¶ 5. The Bergen County Jail ("BCJ") can house a maximum capacity of 1,200 inmates/detainees but, as of December 2, 2020, houses only 184 male and 13 female ICE detainees, along with 303 county inmates. *Id.* ¶ 4. BCJ is thus operating at about 42% of its maximum capacity. *Id.*

- To promote social distancing, BCJ has staggered recreation periods. Dato Decl. ¶ 9(f). Each day Petitioner and other detainees/inmates are permitted to exit their respective housing unit cell areas for three-hour periods to engage in recreation (detainees are out of their cells

5

- for up to 6-8 hours per day). *Id*. To ensure appropriate social distancing, only thirty-two inmates/detainees are permitted to leave the cell area during any recreation period during which they have 2643 square feet of space, which allows ample space for social distancing. *Id*.

- Detainees have been issued surgical and cloth masks. They are not required to wear masks while within their cells, but must wear masks while outside their cells. *Id*. ¶ 9(o).

- Social visitation was suspended from March until September 2020. Currently, such visits must be scheduled in advance, are limited to 15 minutes, and include a maximum of two adults. Detainees and visitors are separated by glass. Phone and video conferencing are available for visitation. *Id*. ¶ 9(c).

- From March 13, 2020 to June 10, 2020, BCJ suspended all new ICE detainee intake. Dato ¶ 9(a). Currently, all new ICE detainees are tested for COVID-19 upon arrival at BCJ and kept in a medical isolation unit until they receive their results. *Id*. ¶ 9(a)(iii).

- The healthcare of BCJ is administered by medical professionals employed by Bergen County, who operate under the supervision of Dr. Michael Hemsley, the on-site facility physician and medical director. Additional medical staff at BCJ consist of the following: 12 full-time RNs, 4 full-time LPNs, and 3 per-diem LPNs, 3 part-time Psychiatrists, and 1 full-time and 1 part-time Dentist. *Id*. ¶ 7.

- Due to the COVID-19 outbreak, additional Bergen County medical staff are now on-site 24/7 to provide full coverage for all detainee medical needs. BCJ has an on-site medical infirmary supervised by Dr. Helmsley. Dr. Hemsley is on call 24/7 for any emergency medical needs. *Id*.

- BCJ is following guidance issued by the CDC for correctional facilities in its evaluation and testing of the detainees in its custody and care. As such, medical staff immediately evaluate any detainees and inmates who complain of illness. Detainees and inmates who feel any symptoms of illness can make daily sick calls as needed. *Id*. ¶ 9(h).

- If a detainee or inmate exhibits signs or symptoms of COVID-19, including fever or respiratory illness, the detainee is provided a surgical mask. Symptomatic detainees and inmates are tested for COVID-19. Tests are administered at BCJ and samples are delivered to Newbridge Medical Center for results. *Id*.

6

- If the detainee or inmate is positive for COVID-19, and does not require hospitalization, the detainee/inmate will return to BCJ and be isolated in a cell in the North 1 housing unit. The confirmed positives currently housed in North 1 are on one side of the housing unit and those individuals otherwise in quarantine are on the other end of the housing unit. There is approximately 30-40 feet between the known positive cases and medical observation cases in North 1. Any individual housed in North 1 is placed in isolation in single-occupancy cells with solid closed doors, and not in open bar cells, with their own personal sink and toilet. *Id.* ¶ 9(i).

- Detainees or inmates who have had a known exposure to a confirmed case of COVID-19, but are asymptomatic, remain housed in the same housing unit but ICE detainees and inmates do not share cells. This process is known as cohorting. Cohorted detainees and inmates remain in a housing unit with other asymptomatic inmates and detainees for a period of 14 days. If no new COVID-19 case develops in 14 days, the cohorting of these detainees ends. *Id.* ¶ 9(k).

- BCJ has increased the general cleaning of the facility with additional staff working through the late-night hours to ensure that the facility is cleaned and disinfected. All housing units are sanitized no less than four times per day. Any common bathrooms are sanitized every shift. Fresh air is constantly circulated by opening doors and utilizing handler/vents throughout the day. Cells at BCJ do not share air vents with another. *Id.* ¶ 9(m).

- All eating is done inside the cells, so inmates and detainees do not congregate for meals in accordance with CDC guidance for correctional facilities. BCJ provides disinfectant spray, hand sanitizer, and soap in every housing unit. Cleaning supplies are available for detainees to sanitize bathroom, telephones, and showers prior to use. The administration is encouraging both staff and the BCJ general population to use these tools often and liberally. *Id.*

- BCJ has not experienced any shortages in cleaning supplies or personal protective equipment. *Id.* ¶ 9(m).

- BCJ provides education on COVID-19 to all staff, detainees, and inmates to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill. *Id.*

- BCJ provides detainees and inmates daily access to sick call. There are signs posted throughout BCJ advising inmates, detainees and staff regarding hygienic protocol and maintaining of proper social distancing. These signs are posted in both English and Spanish. *Id.* ¶ 9(n).

- Prior to entering BCJ, staff members, visitors and vendors must receive a medical screening. These temperature screenings are conducted outside BCJ on every shift. Those individuals who display a temperature above 100 degrees Fahrenheit are not permitted to enter BCJ and are further screened by medical staff. *Id.* ¶ 9(d).

- All staff members have been issued and are wearing masks while inside the facility. Gloves are available to staff as necessary. *Id.* ¶ 9(e).

- The Office of the Bergen County Sheriff bought three electric and one gas-powered fogger to increase disinfectant capacity. These tools are being used to sanitize units in the jail and patrol vehicles after each shift. *Id.* ¶ 9(p).

- BCJ's correctional and medical staff, in conjunction with the New Jersey Department of Health and Centers for Disease Control, have regularly updated their infection prevention and control protocols, and have issued guidance to all staff on screening and management of potential exposure among detainees/inmates. *Id.* ¶ 8.

(D.E. 10, at 7–11.)

The Petition's vague and conclusory allegations that the jail is "unsanitary" and that detainees are unable "to practice social distancing," do not meaningfully contradict the measures discussed above. (D.E. 1, at 1.) Moreover, Petitioner has not presented any evidence demonstrating that the above measures have not been implemented.

Taken together, the Government's actions demonstrate that it has taken significant actions to address the threat of the pandemic, "and that Petitioner's conditions remain rationally related to the Government's interest in detaining him." *Daniel W.A.*, 2020 WL 6336182, at *4 (concluding

similarly in another § 2241 case involving COVID-19 and the Bergen County Jail). Consequently, Petitioner has failed to show that he is entitled to habeas relief on this claim.

### B. Deliberate Indifference Claim

To demonstrate deliberate indifference, petitioners must show that "the Government knew of and disregarded an excessive risk to their health and safety." *Hope*, 972 F.3d at 329. Providing "some care" to a prisoner may not negate a constitutional violation depending on the circumstances. *Id.* (citing *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017)). Yet, deliberate indifference "requires significantly more than mere negligence." *Id.* at 329–30 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998)). To show deliberate indifference, the government's conduct must shock the conscience. *Id.* (citing *Lewis*, 523 U.S. at 846). Consequently, if the "Government has taken concrete steps towards ameliorating the medical effects of COVID-19" a detainee cannot establish deliberate indifference to his medical needs. *Daniel W.A.*, 2020 WL 6336182, at *4 (citing *Hope*, 972 F.3d at 330–31).

As discussed, BCJ has taken a wide variety of concrete steps to protect Petitioner and other detainees from COVID-19. Once again, Petitioner had the opportunity to contest these measures, but he did not file a reply. Additionally, apart from the general allegations regarding sanitation and social distancing, Petitioner does not allege any deliberate indifference specific to his medical needs.[2] (D.E. 1, at 1.)

Accordingly, Petitioner has failed to establish that he is entitled to habeas relief on this claim, and the Court will deny the Petition.

---

[2] Petitioner does offer details about his allegedly deficient dental care, but they do not appear relevant to the issue of COVID-19.

## IV.  CONCLUSION

For the reasons discussed above, the Court denies the Petition. An appropriate Order accompanies this Opinion.

Dated: 4/30/21

_____<br>
JOHN MICHAEL VAZQUEZ<br>
United States District Judge